

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00255-CV

_____

IN THE INTEREST OF J.P-L., A CHILD

On Appeal from the 367th District Court
Denton County, Texas
Trial Court No. 18-8366-367

Before Sudderth, C.J.; Birdwell and Bassel, JJ.
Opinion by Chief Justice Sudderth

## OPINION

## I. Introduction

"Termination of parental rights is traumatic, permanent, and irrevocable." *In re M.S.*, 115 S.W.3d 534, 549 (Tex. 2003). In such a case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, the State "must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)). For the same reason, we carefully scrutinize termination proceedings and strictly construe involuntary-termination statutes in the parent's favor. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012); *E.R.*, 385 S.W.3d at 563; *Holick*, 685 S.W.2d at 20–21. Due process demands the heightened standard of clear and convincing evidence because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see also E.N.C.*, 384 S.W.3d at 802.

Appellant Mother concedes that the evidence in this case is sufficient to support the termination of her parental rights to J.P.-L. but contends that she was deprived of due process when, as acknowledged by the Department of Family and Protective Services (State), "the interests of the child appeared to be in direct conflict

2

with the interests of the parent." Under our current statutory scheme, as between a parent and a child, only one may prevail: the child. *See* Tex. Fam. Code Ann. § 153.002 ("The best interest of the child shall *always* be the *primary* consideration of the court in determining the issues of conservatorship and possession of and access to the child." (emphasis added)). Further, although Mother complains of ineffective assistance of counsel, the record before us does not support reversal under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984).

Thus, despite the serious concerns raised by Mother in her two issues—that her procedural due process rights were violated when her parental rights were terminated despite her mental incapacity and that she received ineffective assistance of counsel when her court-appointed representatives waived any challenge to her capacity by failing to seek a guardianship or mental health commitment for her—we affirm the trial court's judgment.

## II. Background

### A. Procedural Posture

The State filed this suit on September 12, 2018,[1] the same day that the trial court issued an order appointing the State as the child's temporary managing

---

[1]In addition to the best interest requirement, although the State originally alleged grounds for termination under subsections (D), (E), (G), (I), (J), (K), (L), (M), (N), (O), (P), and (Q) of Family Code Section 161.001(b)(1), at trial, the State announced that it was seeking termination of Mother's parental rights only based on constructive abandonment (subsection N) and "lack of compliance with the service

3

conservator, which made the case's dismissal date September 16, 2019. *See* Tex. Fam. Code Ann. § 263.401(a) (stating that the court's jurisdiction terminates on the first Monday after the first anniversary of the date the court rendered a temporary order appointing the State as temporary managing conservator unless trial on the merits has commenced or an extension has been granted). When the State took possession of then-five-year-old J.P.-L., Mother was in University Behavioral Health (UBH), a mental health facility. The trial court reset the initial adversary hearing twice to allow Mother "an opportunity to consult with her [appointed] attorney."

During the adversary hearing, which was held two weeks after J.P.-L.'s removal, when Mother was asked if she had reviewed the trial court's temporary orders, Mother said, "Yes, and I do not agree with them," but she also said that she would do whatever it took to get her son back. At the hearing's conclusion, the trial court appointed a guardian ad litem for Mother, stating in the order, "This Court finds Respondent Mother may not have capacity or may not be competent."

In its temporary orders, the trial court ordered Mother to schedule appointments to complete a psychological evaluation, a psychosocial evaluation, and counseling and to submit to an intake with MHMR or continue with mental health treatment with UBH or another provider "within 10 days of this order." The trial court also ordered her to comply with the usual service plan requirements:

plan" (subsection O). At the trial's conclusion, the trial court terminated Mother's parental rights on those grounds and best interest.

4

completing parenting classes and a drug and alcohol assessment, refraining from all criminal activity and use of alcohol or illegal substances, establishing and maintaining safe, stable, and appropriate housing, attending supervised visits with J.P.-L., and paying child and medical support, in addition to complying with any other requirements in her service plan during the pendency of the suit.

A month after the adversary hearing, the State filed a motion for temporary restraining order, asking the trial court to suspend the parent-child visits because during her supervised visits, Mother had displayed aggressive behavior similar to that which she had displayed at the adversary hearing and had "become increasingly volatile[,] leading observers to become concerned about the safety of the child . . . as well as other persons nearby." Mother's caseworker told Mother that in order to resume visits, she needed to undergo the MHMR intake and to take her medication regularly. The trial court granted the State's motion on October 25, 2018, and ordered Mother to appear at the November 7, 2018 status hearing to determine whether the TRO should become a temporary injunction pending the final hearing.

Mother did not appear at the status hearing, but her attorney said that she had been given notice of the hearing. Her guardian ad litem testified that she went over Mother's service plan with Mother at the CPS office during the same visit that Mother had to be escorted out by the police. According to Mother's guardian ad litem, Mother had indicated that she understood what was asked of her and that she was supposed to call to make appointments with the providers in her service plan, but

5

"she also exhibited a misperception of what CPS was requiring." Mother's guardian ad litem had not had any contact with Mother since that occasion.

In January 2019, Mother's attorney filed a motion to discharge Mother's guardian ad litem because Family Code Chapter 107 did not provide legal authority for the appointment of a guardian ad litem for an adult who had not been declared incapacitated by the proper court for guardianship proceedings, i.e., the probate court. In the motion, she pointed out that Family Code Section 107.010 only provided the court with discretion to appoint an *attorney* ad litem if it found the person incapacitated, and "if appropriate," the attorney ad litem could then refer the proceeding to the probate court. Mother's attorney did not secure a ruling on her motion or refer the proceeding to the probate court.

Mother did not appear at the June 12, 2019 permanency hearing. The trial court noted that the first question from J.P.-L., was, "Do you know where my mom is?" Mother's guardian ad litem said that she had not had any contact with Mother for approximately six months and that the last time she had had any contact, Mother had been homeless and living near the 288 bridge. Mother's counsel said that she was not sure whether Mother had notice of the hearing, although she had provided correspondence to the address Mother had given her (Mother's father's home). Mother's counsel said, "[S]omeone is receiving that information, but it -- none of the correspondence has been signed by my client."

At the June 24, 2019 bench trial, Mother's counsel announced "not ready," citing "lack of communication from [Mother] and lack of knowledge of her whereabouts," and Mother's guardian ad litem agreed, stating, "We are aware that [Mother] has made recent contact with her father. However, at this time she is not here, so I would support [Mother's counsel's] announcement of not ready." Mother's counsel said that she had sent several letters to Mother's last-known residence and that the certified mail was signed for, but not by Mother. She and Mother's guardian ad litem both said that they did not have a working phone number for Mother but had tried to reach her through her father and her friends who had been at previous hearings. The State and the child's attorney ad litem did not agree to a continuance. The trial court denied the motion for continuance, and at the conclusion of the trial, it terminated Mother's parental rights to J.P.-L.[2]

## B. Factual Background

Mother had a history of mental illness in addition to homelessness, drug use, and domestic violence, and her MHMR records were admitted into evidence at the trial, as was a September 12, 2018 certified copy of a police report.

Mother's drug of choice at age 19 was marijuana but ten years later, methamphetamine had replaced it, although she still used marijuana daily for pain,

---

[2]J.P.-L's father's parental rights were terminated as well; he did not appear at the trial and does not appeal.

using a "couple of hits or Vape during the day."[3] Mother started using methamphetamine around the same time that her mother died, when J.P.-L. was approximately three years old. Mother said that she and J.P.-L.'s father, who used "crystal meth," were no longer together because of domestic violence between them that had resulted in a 2016 assault charge against her "because . . . he was a little more beat up than [she] was." Mother said that the charge had been dismissed after she took anger management classes and paid a fine. She told MHMR that she had last tried to quit methamphetamine in 2016 because of the assault charge: "I didn't want my baby's father to get CPS involved."

### 1. Events before the Adversary Hearing

The following events occurred between September 2, 2018, after Mother's father called 911 about her behavior, and the September 28, 2018 adversary hearing.

- **Sunday, September 2, 2018.**

Police took Mother to the Medical City Denton emergency room "due to family reporting aggressive behavior," including that she tried to break a car window and had been smashing plates, and she tested positive for marijuana and methamphetamine. When asked, Mother denied having increased her amount of substance abuse and told Robert Mood, the intake clinician, "I've slowed the f**k down," although she admitted to using a little marijuana daily. Mother both claimed

---

[3]Mother also smoked cigarettes and had a quarter-to-half-a-pack-a-day habit.

8

and also denied that she heard voices, and Mood noted, "Due to client's flight of ideas it is difficult to tell if client is actually experiencing hallucinations." When Mood asked Mother about whether she had a history of substance abuse treatment, Mother responded, "I use magic[,] now leave me alone."

Based on her intake, Mood diagnosed Mother with "unspecified psychosis not due to a substance or known physiological condition," unspecified anxiety disorder, and "[o]ther stimulant abuse, uncomplicated." During her stay in the Medical City ER, Mother had to be restrained by hospital staff. She was transported to Mayhill Hospital from Medical City Denton by mental health deputy transport and was given Ativan to calm her.[4]

- **Monday, September 3, 2018.**

Dr. Asad Islam at Mayhill issued a verified certificate of medical examination for mental illness for Mother in which he listed as a brief diagnosis, "Major Depressive Disorder, recurrent, severe, with psychosis" and the mental health treatments of "medication stabilization, psychiatric evaluation, and medication

---

[4]Ativan is an anti-anxiety medication. *See Moore v. State*, No. 07-10-00507-CV, 2011 WL 3587439, at *5 (Tex. App.—Amarillo Aug. 16, 2011, no pet.) (mem. op.) (appeal of order authorizing psychoactive medications); *see also Hyde v. Menefee*, No. 02-09-00350-CV, 2010 WL 1730803, at *1 (Tex. App.—Fort Worth Apr. 29, 2010, no pet.) (mem. op.) (describing Ativan as an anticonvulsant).

management." Dr. Islam checked all six of the criteria for inpatient commitment,[5] listing as the basis for his opinion,

> [Mother] presented as suffering from tactile and auditory hallucinations. She was not oriented to place, time, nor situation at time of admission. [Mother] reported having suicidal ideation as recently as 2 weeks ago. She demonstrated assaultive behavior before being brought to Mayhill by damaging her father's windshield, assaulting Medical City Denton staff, and throwing things while at Medical City Denton Emergency Room.

In his physician's affidavit, Dr. Islam included the following additional facts:

> [Mother] presented with severe psychosis upon admission and initial evaluation. [She] reported auditory and tactile hallucinations. She stated that she can "taste love" and that she hears voices others cannot but is unable to understand what the voices are saying. [Mother] is unaware of her altered mental state and is not oriented to time, place, or situation. She presented to be in a deteriorated state as evidenced by her poor hygiene, lack of adequate clothing, and inability to maintain her daily living patterns, and the lack of sleep. [Mother] reported suicidal ideations as recently as 2 weeks ago but denied having a plan to carry out the suicide. Police were initially called to patient's father's home due to [Mother] damaging her father's car windshield. Due to her altered mental state, [Mother] became combative and assaulted hospital staff once she was at Medical City Denton. She was also observed throwing objects at staff.

Dr. Islam recommended inpatient hospitalization and medication management.

---

[5]Those criteria were: "likely to cause serious harm to self"; "likely to cause serious harm to others"; "is suffering severe and abnormal mental, emotional or physical distress"; "is experiencing substantial mental or physical deterioration of his ability to function independently, which is exhibited by the Proposed Patient's inability, except for reasons of indigence, to provide for his/her basic needs, including food, clothing, health, or safety"; "is unable to make a rational and informed decision as to whether or not to submit to treatment"; and "[t]he Proposed Patient has an inability to participate in outpatient treatment services effectively and voluntarily."

10

- **Tuesday, September 4, 2018.**

A Mayhill mental health professional filed an application for court-ordered mental health services in the Denton County probate court on Mother's behalf. *See* Tex. Health & Safety Code Ann. § 574.002 (reciting the required contents of an application for court-ordered mental health services). In the supporting affidavit, the applicant stated that Mother was disoriented and unable to make rational decisions for her own care, had been combative, had assaulted Medical City emergency room staff, had demonstrated a lack of cognitive awareness by expressing paranoid delusions, and had reported suicidal ideations within the last two weeks, along with auditory and tactile hallucinations. Some of her delusional statements to deputies included: "[T]he Devil killed Jake," "Joel hears voices from the snake,"[6] and she was "daddy's little monster."

The Denton County Sheriff's Office filed a notification of emergency detention in which a peace officer stated that he had reason to believe that Mother had evidenced a substantial risk of serious harm to herself or others based on her exhibited signs of mental illness, her delusions, her visual or auditory hallucinations, and her confused thinking, and that "[i]n the present mental state the patient cannot make a rational or informed decision regarding her health and safety." Some of the observations listed in the crisis intervention team report were that Mother had

---

[6]Neither Joel nor Jake are names that correspond to anyone identified in Mother's termination-of-parental-rights case.

incoherent or illogical speech, that she was restless, hyperactive, or agitated, and that she appeared to have delusions.

According to Mother's MHMR records, after she met with MHMR staff at court, her mental health case was dismissed. It is unclear when Mother was discharged from Mayhill, but Mother subsequently complained that although she went to Mayhill for help, "[i]nstead they told [her that she] was a meth addict and didn't need medication."

- **Wednesday, September 5, 2018.**

Mother had a follow-up appointment at home with MHMR clinician Lauren Titsworth. At that meeting, Mother both indicated an interest in obtaining MHMR services and denied being interested in them. At one point, she told Titsworth that she was going to sleep and left the room. When Titsworth asked Mother's father if Mother had used drugs since leaving court, he said, "I don't know what she[']s been doing." He then tried to get Mother to come back and talk with Titsworth, and she briefly agreed. Titsworth noted that she had reason to believe that Mother had used methamphetamine since leaving court and might have been under the influence of it during their conversation. An appointment was set for Mother to receive services on Friday, September 7, but the record does not reflect whether she complied.

- **Saturday, September 8, 2018.**

The State received a referral about J.P.-L., and Casie Darter, a Department of Family and Protective Services (DFPS) investigator, began her work.

- **Monday, September 10, 2018.**

Mother used methamphetamine.

- **Tuesday, September 11, 2018.**

Mother called the police "because [she] didn't feel right." She met with MHMR clinician Quinton Neighbors, who noted on a form that Mother had "poor personal hygiene/selfcare" and was "unkempt/disheveled." He also noted Mother's theory that her illness was being used for profit and her ruminations on body-and-soul snatching, stating,

> [Client] stated she believes people are making money off her and she came to psych triage to get help with this situation. [Client] stated she feels isolated and alone because people are not giving her the answers to all of her questions. [Client] stated she feels trapped with her father who she feels is poss[ess]ed by someone else's consciousness. [Client] has been aggressive while on meth last week at the ER. [Client] has not been on drugs as reported by her herself and her collateral. [Client] stated she has anger outburst[s] on occasion by br[e]aking objects to release her anger. [Client] stated she does this to cope and not to [en]danger others. [Client] appears to be calm and has shown no aggression with police or this staff.
>
> . . . .
>
> [Client] stated she has been doing some math and using geometry to find out what [is] the number of the human soul. [Client] stated she found some rec[eipts] and went dump[st]er diving to find spiritual books to figure out the number of her soul. [Client] stated she went to her

13

cousin[']s home who she was told beat up her boyfriend in the past. [Client] stated she had déjà vu while there and felt like she was living her past life with another boyfriend. [Client] stated she was upset with her boyfriend who was really someone else who stole his body. [Client] stated she started arguing with him because she felt he was another soul in his body. [Client's] father and boyfriend stated after this she locked herself in her room and stated she was going to kill everyone in the home. [Client] has a 5 year old son. [Client] stated her son is [J.P.-L.] [Client] stated she kept telling her father to read the bible to understand why she can notice when someone is [in] another['s] bod[y]. [Client] stated she was upset because she was missing time and her room was rearranged differently than it was before. [Client] stated she feels like her father and brother know more about what is really happening. [Client] stated she sometimes disassociates and feels like life is like a movie. [Client] stated she saw two black vans that were following her and her boyfriend a few days ago late at night. [Client] stated she feels these people are trying to protect her from the people who can jump into bodies. [Client] stated she hears voices and people in her attic. [Client] stated she looks around and no one is there.

Mother admitted in her MHMR screening to having used methamphetamine eight times in the prior 30 days and reported having engaged in week-long methamphetamine binges.

Clinician Neighbors reported that Mother said she had had suicidal ideation a month before and that she attempted to hang herself but denied homicidal ideation despite her family's reporting that she had threatened it that day. He reported that Mother "later stated she said this to her family to get her point across to her father about him possibly being controlled by another person's consciousness," but she denied intent and did not mention a method. Neighbors wrote that Mother was not able to crisis plan due to delusional thinking and flight of ideas, and a CPS case was filed "due to minor being in the custody of client who had [homicidal ideation]

14

towards family and delusional thinking." He noted, "[Client] is voluntary and staff will transport client. 24hr phone follow up on 9/12/2018 by 5pm to UBH."

Mother was taken to UBH. The urine sample that she gave that day tested positive for THC,[7] amphetamine,[8] methamphetamine, and benzodiazepine. At the adversary hearing, Mother said that she went to UBH on September 11 because she "wanted answers about why time was different for [her]," explaining that everyone else was "either in slow-mo or fast-mo, and [she was] in turtle speed."

- **Wednesday, September 12, 2018.**

J.P.-L. was removed from Mother's home and placed into foster care pursuant to the trial court's order, and Mother underwent a psychiatric evaluation at UBH with Dr. Garry Watts. During the psychiatric evaluation, Dr. Watts noted that Mother reportedly had had paranoid ideation that people were trying to harm her and break into her home and that while she denied homicidal ideation, she had reportedly threatened family members. She told Dr. Watts that family members were not who

---

[7]THC, an abbreviation for tetrahydrocannabinol, the active ingredient in marijuana, can cause impaired judgment and hallucinations. *See, e.g.*, *Harper v. State*, 508 S.W.3d 461, 466 n.7 (Tex. App.—Fort Worth 2015, pet. ref'd) (reciting chief toxicologist's testimony about THC's side effects).

[8]Methamphetamine metabolizes into amphetamine during the "crash" phase, during which feelings of paranoia, irritability, fatigue, and depression set in. *See, e.g.*, *English v. State*, No. 01-17-00598-CR, 2018 WL 5914767, at *4 (Tex. App.—Houston [1st Dist.] Nov. 13, 2018, pet. ref'd) (mem. op.) (reciting chief toxicologist's testimony about physiological and behavioral effects of recreational methamphetamine use).

15

they seemed to be and that there were "others" posing as family members and "mimicking everything [she did]."

Dr. Watts noted that Mother denied being stressed by her mother's death[9] and denied depression but "endorse[d] hyper-spirituality, grandiosity, and a history of racing thoughts, suggestive of bipolar disorder." With regard to her delusional and grandiose thoughts, Dr. Watts noted that Mother believed she had "spiritual gifts" and that there was something in her blood "that will cure cancer." Mother also denied overt psychotic symptoms but believed that there were evil spirits in her house who were trying to harm her by giving her poisonous drinks with the motive to "get [her] money and get [her] guns." When asked how spirits could acquire physical objects, she did not respond.

Dr. Watts diagnosed her with "bipolar disorder with psychosis versus schizoaffective disorder, bipolar type." And he noted, "There is a reasonable expectation that the patient will make timely and significant practical improvement in the following presenting acute symptoms as a result of psychiatric inpatient hospitalization: Improvement of grandiosity and other manic symptoms, resolution of homicidal ideation, if in fact present, resolution of delusional thinking, increased ability to care for self." The initial discharge plan was for Mother to follow-up with

---

[9]Mother's mother, who suffered from bipolar depression, died three years before this case began.

16

Denton County MHMR and a 12-step program. Dr. Watts noted in his evaluation, "[W]e need to notify CPS" about Mother's admission to UBH.

The Denton County Sheriff's Office began investigating Mother for child endangerment based on CPS referrals from J.P.-L.'s elementary school and UBH.[10] Concerned about J.P.-L.'s absences from school, personnel from J.P.-L.'s elementary school had visited the home three times; twice, they found J.P.-L. outside by a pond, unsupervised, and Mother under the influence of some form of drug. School staff had reported that J.P.-L. told them his mother was sick and in the hospital "[b]ecause she was throwing plat[e]s and breaking windows again." UBH's CPS referral listed Mother's delusional thinking that caused her to have homicidal ideations towards her family and her methamphetamine-positive drug test and referenced her "rage of anger" the previous week in the ER, which had required her to be restrained by hospital staff.

- **Monday, September 17, 2018.**

Mother was discharged from UBH. UBH doctors prescribed for her a six-day supply of Depakote, a mood stabilizer, and Risperdal, an antipsychotic medication.[11]

---

[10]After J.P.-L. tested positive for methamphetamine, Mother was indicted for child endangerment.

[11]"Risperdal (Risperidone) is a psychotropic mood stabilizer used to relieve or improve symptoms such as hallucinations, irrational beliefs and fears, disorganized thinking, severe anxiety, apathy, emotional withdrawal, social withdrawal, and mood swings." *In re L.M.F.*, No. 02-13-00459-CV, 2014 WL 2465137, at *2 n.5 (Tex.

Mother also met with John Lloyd, an MHMR clinician, that day. She reported to Lloyd that she was "having difficulty with CPS after she went to UBH voluntarily." Another psychiatric evaluation was scheduled for her on September 21.

- **Wednesday, September 19, 2018.**

Mother used marijuana.

- **Thursday, September 20, 2018.**

Mother was living in a tent with her boyfriend.

- **Friday, September 21, 2018.**

Mother was evaluated by MHMR clinician Kumud Joshi, to whom she admitted several months of increased use of crystal methamphetamine "because [she] could no longer get prescriptions" prior to both of her September hospitalizations.[12] She explained, "I felt like I was a prophet, and my dad, who was not my dad at the time but he is back now, was trying to keep me trapped so I busted out the window in my dad's car." She also said that she felt like someone had been watching her since October 2017. And she said that she felt like her boyfriend could manipulate time and that she had "regenerated [her]self because of the meth and maybe other people

---

App.—Fort Worth May 29, 2014, no pet.) (per curiam) (mem. op.); *see also Moore*, 2011 WL 3587439, at *5 (explaining that Risperdal takes two weeks to become effective).

[12]Mother completed an interim medical profile update for MHMR indicating that she had smoked "weed" two days before, i.e., around the time she was released from UBH.

jump from people to people because of it." Mother claimed that the methamphetamine helped her activate other parts of her mind. Joshi diagnosed Mother with "unspecified schizophrenia spectrum and other psychotic disorder," "Amphetamine-type substance use disorder, Severe," and "Cannabis use disorder, Mild."

- **Wednesday, September 26, 2018.**

Mother started living under the Loop 288 bridge.

**2. Adversary Hearing (September 28, 2018).**

At the adversary hearing two weeks after the State removed J.P.-L., Mother claimed that every single day for her was two weeks for everyone else, and she expressed her concern about how long it had been since she had seen J.P.-L., stating, "I'm really pissed off that I f**king have missed what has been for me two weeks but it's probably been two years for him." She testified that she did not know whether she had been diagnosed bipolar or schizophrenic, claimed she had no medication for either condition, said that she did not go pick up her prescriptions, and said that her father had her admitted into Mayhill because he said she was an addict. But Mother explained that she had been breaking plates because she "had to shatter the glass to let out whatever people were seeing. And it works. Because [she] broke about five more plates, and [her] dad is back to normal." Mother also said that she had lupus but was not accepting treatment because she did not want to be "some guinea pig."

19

Mother said that while she had been living under the Loop 288 bridge, she and her father were the only people currently living in his home

> [b]ecause everyone else had to leave[13] because of this addiction of the stereotypes of: You're an addict. You're a horrible person. You can't function in life. You can't be a member of a family or a member of a group, which is complete bull crap. Because there are more addicts addicted to prescription drugs, pharmaceuticals. Pharmaceutical drugs -- you don't even prescribe the right prescription for people. It's who pays the biggest -- the hospital the biggest money, to what pills can be given.

Mother claimed that she was not addicted to anything but that she liked marijuana ("weed") and despite her open CPS case had continued to use it, explaining, "I believe that's my right." She had not spoken to her father's side of the family since her mother had died, saying, "They are a part of that group that stereotypes what drugs do to people, instead of understanding and believing and realizing that sometimes it's just self-medication, that sometimes what doctors know isn't really everything."

Mother denied that she had taken any medication before the hearing but then admitted that she had taken a Xanax[14] that she had gotten from a friend[15] because

---

[13]DFPS investigator Darter interviewed J.P.-L., Mother's father, and Mother's boyfriend and his family, who had also been residing in the home.

[14]Xanax is a common brand name for benzodiazepine. *In re P.M.*, No. 02-14-00205-CV, 2014 WL 8097064, at *10 (Tex. App.—Fort Worth Dec. 31, 2014, pet. denied) (mem. op. on reh'g).

[15]Mother gave her friend's first name but refused to give his last name, stating, "I'm not trying to get no one else in trouble." She said that the pill might not have been prescribed for her friend and then alluded to "an underground world that I know every single one y'all know about."

"this is all a little stressful." She also denied that she had kept J.P.-L. out of school for at least seven days, stating that she had kept him out for three days that corresponded with her three friends' birthdays, and claimed that she did not know that the assistant principal at her son's school had been out to her house multiple times.

Mother said that she had "sacrificed [her] entire life" to take care of J.P.-L. by giving up partying, her friends, and her social life. She acknowledged that her son played alone outside near a pond where he had once caught a baby copperhead snake and once caught a baby water moccasin and that he had been bitten a handful of times by nonpoisonous snakes. Defensively, Mother said, "But Steve Irwin used to catch animals that were venomous" and pointed out that animals and people bite. When asked if she bit other people, Mother replied, "Sometimes . . . if they like it." She said that she had never taken J.P.-L. to the dentist because they did not have dental insurance and acknowledged that his front teeth were almost black[16] before pointing out her own dental problems and blaming all of it on the only food that she could afford to buy, "sodas and all those acidicy [sic] foods."

After Mother testified, Darter gave the following testimony:

---

[16]At the final trial, Marilyn Popek, the court-appointed special advocate (CASA volunteer), testified that when J.P.-L. was removed from Mother, his only teeth that did not have problems were his five or six lower front teeth—"after he came into foster care, ten crowns, four teeth were pulled, and one molar had already fallen out." J.P.-L.'s foster father testified that J.P.-L. had to have a significant number of teeth capped because of malnourishment and from eating so much sugary food. J.P.-L. had also been behind academically.

Q. Does the Department, following your investigation, have concerns regarding [Mother's] mental health?

A. Yes.

Q. Does the Department believe that [Mother's] mental health conditions and the lack of treatment potentially pose a risk to the child?

A. Yes.

Q. Does the Department believe that continuation of [J.P.-L.] in [Mother's] care would pose a risk to his physical health or safety?

A. Yes.

The State's attorney then offered into evidence an acknowledgment that Mother had signed regarding her recent marijuana and methamphetamine use, which the trial court admitted without objection by anyone except Mother herself, who objected aloud. Mother informed the trial court that her court-appointed attorney did not want to tell the court what Mother had said. When Mother interrupted her counsel, and the trial court told her that she had an attorney who would speak for her, Mother retorted, "That is appointed by y'all." She then elaborated, "I didn't even want an attorney. I wanted to sit here and tell you what I needed to tell you." The trial court warned Mother that if she continued to talk, there would be consequences and that her insistence on going against the advice of her counsel was her choice but might not be in her best interest. Mother started crying, replied, "I don't understand why anyone would want to keep a son away from his mother and a mother away from

her son," and said that she had not known Darter, the DFPS investigator, was going to use the document she signed against her to make it seem like she was a drug addict.

During cross-examination by Mother's counsel, Darter admitted that she did not discuss with Mother that the acknowledgment would be used against her in a court proceeding, that Mother was not represented by counsel when she signed it, and that she did not know if Mother had been under the influence of any substance when she signed the document.

At the conclusion of the hearing, as the trial court was making its findings, Mother made multiple interjections,

> [Mother]: This -- the system f**king fails --
>
> THE COURT: Okay.
>
> [Mother]:-- for everybody.
>
> THE COURT: Okay. I want you -- you have to be quiet, and if you swear going out the door, you need to understand you can be put in jail for it. So I understand --
>
> [Mother]: *(Overlapping)* Why not? Why not? What do you want me to do? What else do you want me to do?
>
> THE COURT: Okay. I'm not going to argue --
>
> [Mother]: *(Overlapping)* Did I not change the world over the past two weeks? Did I not work for every person and the willpower to f**king be here *(crying)*?
>
> THE COURT: Okay. I will tell you, one more outburst, and you're going to go into the cells. Okay?
>
> [Mother]: Might as well.

23

THE COURT: *(Overlapping)* Talk to your -- not one -- not even another word. Okay? Not even another word. You can go outside and talk to your attorney in one of the rooms.

[Mother]: I don't have my son. I don't know how to act at all.

THE COURT: *(Overlapping)* Okay. Go ahead and escort her out into one of the rooms. Because your other choice is to the cell.

[Mother]: You failed the Lord today.

After Mother was escorted from the courtroom, Mother's counsel informed the trial court that Mother had not been undergoing treatment, although "[s]he should be." The trial court noted, "[W]e actually had someone from the mental health unit here observing," but because Mother had not said anything regarding self-harm or harm to others, the observer had indicated that Mother "can live under the bridge if she'd like to as long as she's not harming herself or ha[ving] suicidal ideations."

After the State's attorney suggested that "a guardian ad litem for her may be something the Court wants to consider as far as her capacity," and Mother's counsel concurred, stating, "[I]t should be a step that the Court strongly considers taking," the trial court appointed an attorney who was in court that day on another case as Mother's guardian ad litem.

### 3. Events After the Adversary Hearing

After the October 25, 2018 TRO halted Mother's visits with J.P.-L.,[17] Mother's caseworker and CASA volunteer lost all contact with her, and Mother did not appear at the June 24, 2019 trial.

During the trial, Mother's father testified that the last time he had seen Mother was two and a half weeks before, when she came by his house for a few days. He did not know whether she had gathered any of the mail that had been delivered to his home for her, and they did not discuss any case dates. Mother told him that she was living in the homeless camp off of 288. She did not have a working phone. He further testified, "She's still not right," by which, he explained, Mother was angry all the time, depressed, and "quasi close to violence, it seems like, constantly." He said that Mother was not at a point in her life where she could safely parent J.P.-L., stating, "She's just – she's not who she was" and that "she's not completely in touch with reality, from what [he could] tell."[18] He acknowledged that she had been using

---

[17]Popek, the CASA volunteer, testified that at the visits, Mother and J.P.-L.'s relationship had been inappropriate because "it was as if [J.P.-L.] were the adult and she were the child. He was constantly taking care of her." She said that when Mother acted out, it upset J.P.-L.

[18]J.P.-L.'s foster father testified that he and his wife wanted to adopt J.P.-L. J.P.-L.'s caseworker, Anna Van Buskirk, and Popek, the CASA volunteer, both recommended the termination of Mother's parental rights as in his best interest. Van Buskirk testified that Mother had not taken any action "to mitigate the concerns present at removal and to provide a safe and stable home environment for [J.P.-L.]" Popek recommended that Mother's parental rights to J.P.-L. be terminated because

marijuana for several years but said that he did not know how long she had been using methamphetamine.

Mother's guardian ad litem told the trial court that based on her interactions with Mother, she did not believe that Mother had understood what the service plan really meant and what actions really had to be taken based "on her mental health, not on any type of drug or illegal substance issue." She opined that Mother's mental health issues had "prohibited her from understanding the full impact of the case . . . and the necessity of her involvement in the case."

At the conclusion of the trial, the trial court expressed concern about the mental health issue, stating,

> Let me ask you this: Are . . . there cases that deal with the potential mental health instability of a parent whose rights are being asked to be terminated? In other words, using a very bad analogy, if someone is -- lacks the mental capacity, then there's some cases about whether or not they can be -- have a death sentence. Okay? That in and of itself, as opposed to a person who knowingly and intentionally has done all of the things that have been testified here today, are there any cases that anyone knows of that have been written on regarding having a -- I'll say, at least a potentially mental health or -- it's not mental retardation, but I'm just saying a -- an -- an inability to understand, and that being, certainly by her actions, a -- a reason that falls within the scope of allowing termination.

she had not worked her services or shown an attitude of caring for his best interest during the five visits that Mother had with him before the TRO.

The trial court also noted, "[T]o the extent a guardian was actually appointed to represent [Mother] in this action gives the Court some indication that there was a concern about her mental health or mental capacity in the past."

The child's attorney ad litem asserted that capacity was presumed unless Mother raised it as a defensive issue and presented evidence on it and that there was no evidence that there had been a guardianship proceeding to revoke Mother's capacity. The State's attorney referred the court to Family Code Section 161.003 and asked the trial court to allow the State to prove up that ground if the court was unwilling to grant termination on the grounds sought by the State but opined that Mother's lack of attendance at any of her services might prevent them from being able to prove Mother's mental status.[19] The State's attorney also argued that there was no requirement under Section 161.001 that the parent understand the service plan under subsection (O) and no mens rea requirement under subsection (N).

Ultimately, the trial court terminated Mother's parental rights based on the child's best interest, constructive abandonment, and her failure to comply with the court-ordered service plan, identifying in particular Mother's failure to provide adequate care for the child based on her homelessness, J.P.-L.'s severe dental condition when he was removed from her, her lack of parenting skill and poor

---

[19]Although the State mentioned Family Code Section 161.003 in its original petition with regard to the appointment of an attorney, it did not cite it as a ground for terminating Mother's parental rights in its petition, and Section 161.003 was not the basis of the trial court's termination order.

judgment as illustrated by her inability to make sure that J.P.-L. had adequate attendance at school, her failure to maintain contact with her caseworker or CASA volunteer, and her failure to perform her service plan.

### III.  Discussion

In her first issue, Mother argues that she was mentally incapacitated when she was served with process and when the trial court requested that a "mental health worker" observe the adversary hearing.  She contends that although capacity requires a verified denial, the State tried the capacity issue by consent and that the trial court's action in sua sponte appointing a guardian ad litem for her was "mere window dressing and tantamount to a violation" of her due process rights.  Mother complains that the failure of both the trial court and her attorney ad litem to make a referral to the Denton County Probate Court tainted the trial's outcome and that the trial court abused its discretion by denying her request for a continuance.  In her second issue, Mother further complains that because she was never provided adequate representation, the termination of her parental rights to J.P.-L. violated her constitutional right to due process.

The State acknowledges that Mother "was obviously mentally ill" at the adversary hearing but argues that UBH had discharged her and that there was no evidence before the trial court that Mother actually lacked capacity.  The State asserts that because the Family Code does not prescribe a competency standard that parents must meet before a trial to terminate their parental rights and because Mother's

request for a continuance was made by oral motion only, the trial court did not abuse its discretion by proceeding to trial even though Mother was homeless, nowhere to be found, and possibly mentally ill, or thereby deprive her of due process or effective assistance of counsel.

## A. Due Process

A parent's right to retain custody of his children is a constitutionally protected liberty interest that must be afforded procedural due process. *In re M.R.J.M.*, 280 S.W.3d 494, 500 n.6 (Tex. App.—Fort Worth 2009, no pet.) (citing *In re G.C.,* 66 S.W.3d 517, 524–25 (Tex. App.—Fort Worth 2002, no pet.)). The issue is what process is "due" before those rights may be terminated. *See In re R.M.T.*, 352 S.W.3d 12, 16–18 (Tex. App.—Texarkana 2011, no pet.) (discussing state and federal due process guarantees); *see generally Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 903 (1976) (setting out the three factors required to evaluate a procedural due process claim: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used and the probable value of additional safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that additional or substitute procedural requirements would entail).

However, complaints about due process violations must be raised and ruled on in the trial court in order to be preserved for appeal. *In re L.M.I.*, 119 S.W.3d 707, 710–11 (Tex. 2003); *In re J.J.A.*, No. 14-18-00530-CV, 2018 WL 6614236, at *5 (Tex.

App.—Houston [14th Dist.] Dec. 18, 2018, no pet.) (mem. op.). Mother's counsel did not raise due process as a ground when she sought a continuance, and to the extent that Mother complains of a violation of due process outside of her continuance and ineffective-assistance arguments, she has not preserved this complaint for our review.

## B. Denial of Continuance

Whether the trial court grants or denies a motion for continuance is within its sound discretion. *See BMC Software Belg., N.V. v. Marchand,* 83 S.W.3d 789, 800 (Tex. 2002); *In re E.A.W.S.,* No. 02-06-00031-CV, 2006 WL 3525367, at *5 (Tex. App.—Fort Worth Dec. 7, 2006, pet. denied) (mem. op.). A trial court abuses its discretion if it acts without reference to any guiding rules or principles—that is, if its act is arbitrary or unreasonable. *Low v. Henry,* 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings,* 134 S.W.3d 835, 838–39 (Tex. 2004). An appellate court cannot conclude that a trial court abused its discretion merely because the appellate court would have ruled differently in the same circumstances. *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 558 (Tex. 1995); *see also Low,* 221 S.W.3d at 620.

As pointed out by the State, a trial court generally does not abuse its discretion when it denies an oral motion for continuance. *See* Tex. R. Civ. P. 251 (stating that no continuance shall be granted "except for sufficient cause supported by affidavit, or by consent of the parties, or by operation of law"); *In re M.A.-O.R.,* No. 02-11-00499-CV, 2013 WL 530952, at *5 (Tex. App.—Fort Worth Feb. 14, 2013, no pet.) (mem.

30

op.) (holding no abuse of discretion when pro se mother made an oral motion for continuance just before the termination trial began and the record did not contain a written motion for continuance, an affidavit, or sworn testimony in support of the motion).

Further, a party's mere absence does not entitle her to a continuance. *In re A.L.P.*, No. 01-19-00144-CV, 2019 WL 3949461, at \*4 (Tex. App.—Houston [1st Dist.] Aug. 22, 2019, no pet. h.) (mem. op.); *Erback v. Donald*, 170 S.W.2d 289, 291–92 (Tex. App.—Fort Worth 1943, writ ref'd w.o.m.) (explaining that the absent party must show that she has a reasonable excuse for failing to appear and that her absence prejudiced her); *see In re D.W.*, 353 S.W.3d 188, 192 (Tex. App.—Texarkana 2011, pet. denied) ("[O]nce a party has made an appearance, she has the responsibility to keep the court and her own counsel apprised of a location where [notice of the trial setting] can be effected."). And according to at least one of our sister courts, nor does a parent's alleged incompetency. *See In re E.L.T.*, 93 S.W.3d 372, 374 & n.1 (Tex. App.—Houston [14th Dist.] 2002, no pet.).

Because Mother did not comply with Rule 251 and two of the parties disagreed with her oral request for a continuance, the trial court did not abuse its discretion by denying the motion. *Compare D.W.*, 353 S.W.3d at 193 (holding that trial court did not abuse its discretion by denying continuance motion on first day of trial when counsel did not know mother's whereabouts despite recognizing that mother's "mental shortcomings almost surely contributed to her failure to maintain contact with her

31

attorney" because it remained mother's responsibility to make her whereabouts known to her counsel), *with In re L.N.C.*, 573 S.W.3d 309, 321 & n.6, 323 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (declining to apply presumption that arises from failure to comply with Rule 251 when appellant father, who had been properly bench-warranted, was unable to appear without sheriff's office's full compliance with the bench warrant and holding that he was denied due process when he was not brought to trial in accordance with the bench warrant).

## C. Ineffective Assistance of Counsel

While an indigent parent's statutory right to counsel in a termination-of-parental-rights case filed by the State includes the right to effective assistance of counsel, in order to satisfy her burden of showing that trial counsel was ineffective, Mother must show both (1) that trial counsel's performance was deficient and (2) that the deficient performance by trial counsel prejudiced her case. *See M.S.*, 115 S.W.3d at 544–45 ("Under *Strickland*, the defendant, to establish an ineffective assistance claim, must successfully show both prongs of the inquiry.").

With respect to whether counsel's performance in a particular case is deficient, we must take into account all of the circumstances surrounding the case and must primarily focus on whether counsel performed in a "reasonably effective" manner. *Id.* at 545. In this process, we must give great deference to counsel's performance, indulging a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, including the possibility that counsel's actions are

32

strategic. *Id.* It is only when the conduct was so outrageous that no competent attorney would have engaged in it that the challenged conduct will constitute ineffective assistance. *Id.*

Likewise, even if the parent can show that her trial counsel's performance was deficient, she must still show that the deficient performance caused harm, i.e., that there is a reasonable probability that, but for counsel's unprofessional error or errors, the proceeding's result would have been different. *Id.* at 550. That is, the parent must show that counsel's errors were so serious as to deprive her of a fair trial, defined as a trial whose result is reliable. *In re H.R.M.*, 209 S.W.3d 105, 111 (Tex. 2006). We may not speculate in order to find trial counsel ineffective when the record is silent regarding counsel's reasons for her actions. *In re F.L.H. IV*, No. 04-17-00425-CV, 2017 WL 6597829, at *15 (Tex. App.—San Antonio Dec. 27, 2017, pet. denied) (mem. op.) (quoting *Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 623 (Tex. App.—Houston [1st Dist.] 2009, pet. denied)).

### 1. Failure to File Written Motion for Continuance

Mother's counsel's failure to file a motion for continuance that complied with Rule 251 was not ineffective assistance of counsel under the circumstances of this case.

Mother concedes in her brief that the evidence was sufficient to terminate her parental rights, and our review of the record finds ample support for this concession. Accordingly, even if her counsel had filed a written motion for continuance supported

by an affidavit, by the date of the June 24, 2019 trial, Mother had been absent from the case and from J.P.-L.'s life for approximately nine months and had failed to comply with the court-ordered service plan, meeting both the constructive abandonment[20] and failure-to-comply[21] termination grounds in addition to demonstrating by clear and convincing evidence that termination of her rights was in J.P.-L.'s best interest.[22]

---

[20]The trial court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that termination is in the child's best interest and that the parent has constructively abandoned the child who has been in the State's permanent or temporary managing conservatorship for not less than six months and (i) the State has made reasonable efforts to return the child to the parent; (ii) the parent has not regularly visited or maintained significant contact with the child; and (iii) the parent has demonstrated an inability to provide the child with a safe environment. Tex. Fam. Code Ann. § 161.001(b)(1)(N), (2).

[21]The trial court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that termination is in the child's best interest and that the parent has failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the State's permanent or temporary managing conservatorship for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child. Tex. Fam. Code Ann. § 161.001(b)(1)(O), (2).

[22]Evidence probative of a child's best interest may be the same evidence that is probative of a subsection (1) ground. *In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013). And while a court must employ a strong presumption that keeping a child with a parent serves the child's best interest, *see In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), it must also consider the nonexclusive *Holley v. Adams* factors, which include the child's current and future emotional and physical needs, the parenting abilities of the individuals seeking custody, the stability of the home or proposed placement, the parent's acts or omissions indicating that the parent-child relationship is not a proper one, and any excuse for the parent's acts or omissions. 544 S.W.2d 367, 371–72 (Tex. 1976).

Because we have nothing in the record and may not speculate to explain why counsel did not file a written motion for continuance, and because counsel's error, if any, was not so serious as to deprive Mother of a trial whose result was reliable, we cannot say that Mother's trial counsel committed ineffective assistance with regard to the oral motion for continuance. *See also* Tex. R. App. P. 44.1(a) (requiring, for reversal, that an appellant show that the trial court erred and that the error probably caused the rendition of an improper judgment or probably prevented the appellant from properly presenting the case to this court). We overrule this portion of Mother's issues.

**2. Failure to File Guardianship Proceeding**

Mother also contends that she received ineffective assistance of counsel when her attorney did not file a guardianship proceeding in the probate court. We first examine the law pertaining to guardianship and then termination-of-parental-rights cases involving guardians ad litem.

**a. Statutory and Rules-based Ad Litem Provisions**

**(1) Title 3 of the Estates Code**

Title 3 of the Estates Code covers guardianship and related procedures.[23] *See* Tex. Est. Code Ann. §§ 1001.001–1357.102. "Guardianship proceedings" can include

---

[23]One alternative to guardianship is the execution of a declaration for mental health treatment under Civil Practice and Remedies Code Chapter 137. Tex. Est. Code Ann. § 1002.0015; *see* Tex. Civ. Prac. & Rem. Code Ann. § 137.001(6) (defining "incapacitated" as—in the opinion of the court in a guardianship proceeding under

mental health actions in addition to the application, petition, or motion regarding guardianship, *id.* § 1002.015, but regardless of nomenclature, all guardianship proceedings must be filed and heard in a court exercising original probate jurisdiction, and that court has jurisdiction of all matters related to the guardianship proceeding. *Id.* §§ 1021.001, 1022.001. The probate court can exercise pendent and ancillary jurisdiction "as necessary to promote judicial efficiency and economy." *Id.* § 1022.001. *But cf.* Tex. Fam. Code Ann. § 155.001 (stating that in a suit affecting the parent-child relationship, if a court of this state has acquired continuing, exclusive jurisdiction, no other court of this state has jurisdiction of a suit with regard to that child except as provided by Family Code Chapter 155, Chapter 262, or Section 103.001(b)). In a county in which there is a statutory probate court, that court has exclusive jurisdiction of all guardianship proceedings, regardless of whether contested or uncontested. Tex. Est. Code Ann. §§ 1022.002, .005.

A guardianship is created to promote and protect the well-being of an incapacitated person, and when a court creates a guardianship, there is a presumption that the incapacitated person retains capacity to make personal decisions about her residence. *Id.* § 1001.001(a)–(b) (providing that the court shall design the guardianship to encourage the development or maintenance of maximum self-reliance

---

the Estates Code or in a medication hearing under Health and Safety Code Section 574.106—lacking the ability to understand the nature and consequences of a proposed treatment and the ability to make mental health treatment decisions because of impairment).

and independence in the incapacitated person).  Under the Estates Code, an "incapacitated person" may be someone who is (1) mentally, physically, or legally incompetent, such as a minor,[24] or an adult who, because of a physical or mental condition, is substantially unable to provide food, clothing, or shelter for herself, unable to care for her own physical health, or unable to manage her own financial affairs; (2) judicially declared incompetent; or (3) a habitual drunkard.  *Id.* §§ 22.016(2), 1001.003, 1002.017.  And a "guardian ad litem," under the Estates Code, is someone appointed by a court to represent the incapacitated person's best interests in a guardianship proceeding.  *Id.* § 1002.013.

In a traditional guardianship, a guardian ad litem is an officer of the court who "shall protect the incapacitated person whose interests the guardian had been appointed to represent in a manner that will enable the court to determine the action that will be in that person's best interests."  *Id.* § 1054.054(a), (b).  This includes investigating whether a guardianship is necessary for the proposed ward and evaluating alternatives to guardianship and supports and services available to the

---

[24]A parent's status as a minor will not toll a termination-of-parental-rights suit. *In re G.A.C.*, 499 S.W.3d 138, 139 (Tex. App.—Amarillo 2016, pet. denied).  In *G.A.C.*, the minor parent was appointed an attorney to serve as her guardian ad litem. *Id.* at 140.  The court held that this appointment, in addition to the appointment of counsel, afforded her sufficient due process.  *Id.* at 141–42 ("It is the child's best interest and not the parent's best interest that the statutes pertaining to parental termination proceedings are intended to promote.").

proposed ward that would avoid the need for a guardian's appointment. *Id.* § 1054.054(c).

If a court has probable cause to believe that a person domiciled or found in the county in which the court is located is an incapacitated person and that person does not have a guardian, the court shall appoint a guardian ad litem or court investigator to investigate the person's conditions and circumstances to determine whether the person is incapacitated and whether a guardianship is necessary. *Id.* § 1102.001(a). To establish probable cause, the court may require an "information letter" about the person believed to be incapacitated that is submitted by an interested person or a written letter or certificate from a physician who has recently examined the person believed to be incapacitated. *Id.* § 1102.002; *see also id.* § 1102.003 (setting out contents of "information letter").

A court may also appoint a temporary guardian, with limited powers, if presented with substantial evidence that a person may be incapacitated and if the court has probable cause to believe that the immediate appointment of a guardian is necessary. *Id.* § 1251.001(a). But a person for whom a temporary guardian is appointed may not be presumed to be incapacitated, *id.* § 1251.002, and a sworn, written application for the appointment of a temporary guardian must still be filed before the appointment, and it must state, among other things, the danger to the person or property that is alleged to be imminent. *Id.* § 1251.003(a), (b)(2). And once the application for temporary guardianship is filed, a hearing on it must be set and

should be held (subject to exceptions) within 10 days of the application's filing; a temporary guardianship usually remains in effect for only 60 days. *Id.* §§ 1251.005–.006, .151.

A guardian ad litem or a court investigator who, after conducting a Section 1102.001 investigation, believes that the person is incapacitated and that a guardianship is necessary shall file an application for the appointment of a guardian of the person or estate, or both, for the person. *Id.* § 1102.004. That application is comprehensive, particularly with regard to the "nature and degree of the alleged incapacity, the specific areas of protection and assistance requested, and the limitation or termination of rights requested to be included in the court's order of appointment," which include the right to vote in a public election, to hold or obtain a driver's license, or to make personal decisions regarding residence. *Id.* § 1101.001(b)(4).

After the application is filed, at a hearing for the appointment of a guardian, the court shall inquire into the allegedly incapacitated adult's ability to feed, clothe, and shelter herself, care for her own physical health, and manage her property or financial affairs, and a proposed ward is entitled to a jury trial on the question upon request. *Id.* §§ 1101.051(a), .052. And before a guardian may be appointed, the probate court must find by clear and convincing evidence that the proposed ward is incapacitated, that it is in her best interest for the court to appoint a guardian, that her rights or property will be protected by that appointment, that alternatives to guardianship that

would avoid the need for the appointment have been considered and determined not to be feasible, and that support and services available to the proposed ward that would avoid the need for the appointment have been considered and determined not to be feasible. *Id.* § 1101.101(a)(1)(A)–(E). The court must also find by a preponderance of the evidence that the proposed ward is totally without capacity to care for herself and to manage her property or lacks the capacity to do some, but not all, of the tasks necessary to care for herself or to manage her property, and the court may not grant the guardianship application unless the applicant proves each element required by Title 3 of the Estates Code. *Id.* § 1101.101(a)(2)(D), (b).

Further, the determination of an adult proposed ward's incapacity (other than a person who must have a guardian to receive governmental funds) must be evidenced by recurring acts or occurrences in the preceding six months and not by isolated instances of negligence or bad judgment. *Id.* § 1101.102. And unless the proposed ward suffers from an intellectual disability, before the court may grant an application to create a guardianship for an incapacitated person, the applicant must present to the court a physician's written letter or certificate describing the nature, degree, and severity of the proposed ward's incapacity. *Id.* § 1101.103(a)–(b). A court order appointing a guardian must contain findings of fact and specify a variety of items, including how much authority the guardian has and whether the ward is totally incapacitated because of a mental condition. *See id.* §§ 1101.151–.152.

If a guardianship is instituted, the ward retains all rights, benefits, responsibilities, and privileges granted by the federal and state constitutions and laws "except where specifically limited by a court-ordered guardianship or where otherwise lawfully restricted." *Id.* § 1151.351(a); *see id.* § 1151.001 ("An incapacitated person for whom a guardian is appointed retains all legal and civil rights and powers except those designated by court order as legal disabilities by virtue of having been specifically granted to the guardian."). "An adjudication of incapacity in a guardianship proceeding fixes the individual's status as an incapacitated person *at that time.*" *In re K.M.L.*, 443 S.W.3d 101, 111 (Tex. 2014).

### (2) Rule of Civil Procedure 173

Rule of Civil Procedure 173 does not apply to an appointment of a guardian ad litem governed by statute or other rules. Tex. R. Civ. P. 173.1. Under Rule 173, the court must appoint a guardian ad litem for a party represented by a next friend or guardian only if the next friend or guardian appears to have an interest adverse to the party or the parties agree. Tex. R. Civ. P. 173.2(a). The court may appoint a guardian ad litem sua sponte or on the motion of any party but must make the appointment by written order. Tex. R. Civ. P. 173.3(a)–(b). A guardian ad litem appointed under Rule 173 acts as an officer and advisor to the court in determining whether a party's next friend or guardian has an interest adverse to the party and to determine and advise the court whether a settlement offer is in the party's best interest. Tex. R. Civ. P. 173.4(a)–(c). The guardian ad litem must not participate in discovery, trial, or any

other part of the litigation unless further participation is necessary to protect the party's interest that is adverse to the next friend's or guardian's and the participation is directed by the court in a written order stating sufficient reasons. Tex. R. Civ. P. 173.4(d).

The Comment following Rule 173 makes clear that the rule "does not apply when the procedures and purposes for appointment of guardians ad litem (as well as attorneys ad litem) are prescribed by statutes, such as the Family Code and the Probate Code, or by other rules, such as the Parental Notification Rules." Tex. R. Civ. P. 173 cmt.

### (3) Family Code Ad Litem Provisions

While the Family Code does not provide for the appointment of a guardian ad litem for an incapacitated person, the court may appoint an attorney ad litem if the court finds that the person is incapacitated. Tex. Fam. Code Ann. § 107.010; *see also id.* § 107.013 (providing that in a termination or conservatorship suit filed by the State, the court shall appoint an attorney ad litem to represent the interests of an indigent parent, a parent served by citation by publication, or—under certain circumstances—an alleged father); *cf. id.* §§ 101.0145, 107.001(2) (defining "attorney ad litem" as an attorney who provides legal services to a person, including a child, and who owes to the person the duties of undivided loyalty, confidentiality, and competent representation), (5) (defining "guardian ad litem" as a person appointed to represent the child's best interest).

42

Under Section 107.010, the attorney ad litem "shall follow the person's expressed objectives of representation and, *if appropriate*, refer the proceeding to the proper court for guardianship proceedings." *Id.* § 107.010 (emphasis added).

In suits affecting the parent-child relationship (SAPCRs),[25] guardians ad litem—as opposed to attorneys ad litem—may be appointed for children and young adults but not parents. *See id.* § 107.002 (describing the powers and duties of a child's guardian ad litem under Family Code Chapter 107), § 107.011(a) (stating that in a suit filed by the State seeking termination of the parent-child relationship or the appointment of a conservator for a child, the court shall appoint a guardian ad litem to represent the child's best interest immediately after the petition is filed but before the full adversary hearing), § 107.016(1) (providing that an order appointing the State as the child's managing conservator may provide for the continuation of the appointment of the guardian ad litem for the child for any period during the time the child remains in the State's conservatorship), § 107.0161 (pertaining to appointment of a guardian ad litem for a child committed to the Texas Juvenile Justice Department), § 107.022 (stating that in a suit other than for termination or appointment of the State as the child's conservator, the court may not appoint an attorney to serve as both attorney and guardian ad litem or a volunteer advocate to

---

[25]A SAPCR is a suit filed as provided by Title 5 of the Family Code in which the appointment of a managing conservator or a possessory conservator, access to or support of a child, or the establishment or termination of the parent-child relationship is requested. Tex. Fam. Code Ann. § 101.032(a).

serve as guardian ad litem for a child unless certain circumstances apply), § 107.031 (providing that the trial court may appoint a volunteer advocate from a charity to appear as a child's guardian ad litem in a termination-of-parental-rights suit), § 153.009(e) (providing that at any trial or hearing, the court may permit the child's guardian ad litem to be present for an interview with the child in chambers), § 263.0021(b)(6) (providing for notice of hearing to child's guardian ad litem), § 263.0025(e) (providing that the court may appoint a foster child's guardian ad litem as the child's surrogate parent for special education decision-making), § 263.303(a) (stating that within 10 days before each permanency hearing, the child's guardian ad litem—among others—is entitled to a permanency progress report by the State), §§ 263.605–.606 (providing that a court may continue or renew the appointment of a guardian ad litem for a young adult to help him or her access state services), § 264.018(e)(3), (f)(3) (stating the State must provide notice to the child's guardian ad litem, among others, when changing the child's residential child-care facility or when becoming aware of a significant event affecting the child), § 264.107(e) (stating that in making nonemergency placement decisions, the State must consult with the child's caseworker, attorney ad litem, and guardian ad litem), § 264.123(a)(4) (stating that if a child in the State's managing conservatorship is missing from the child's substitute care provider, the State shall notify—among others—the child's guardian ad litem), § 266.0041(f) (providing that the court may appoint any person eligible to serve as the foster child's guardian ad litem as the child's independent medical advocate).

### b. Case Law on Competence and Capacity

"Capacity" refers to an individual's ability to understand the nature and consequences of his or her actions. *See, e.g.*, Tex. Health & Safety Code Ann. § 574.101(1); *State ex rel. T.M.*, No. 12-19-00160-CV, 2019 WL 4462675, at *2 (Tex. App.—Tyler Sept. 18, 2019, no pet.) (mem. op.) (explaining capacity in the context of a patient's decision-making with regard to the administration of psychoactive medications); *cf.* Tex. R. Civ. P. 93(1) (requiring a pleading with regard to the lack of legal capacity to sue or be sued to be verified).

"Competence," on the other hand, is a legal finding that refers to the individual's ability to consult with his or her lawyer with a reasonable degree of rational understanding or a rational as well as factual understanding of the proceedings against him. *See* Tex. Code Crim. Proc. Ann. art. 46B.003(a) ("Incompetency; Presumptions"). Under the Code of Criminal Procedure, a defendant is presumed competent to stand trial and shall be found competent to do so unless proved incompetent by a preponderance of the evidence. *Id.* art. 46B.003(b). And on the civil side, the rights of incompetents are generally protected by rules that in some circumstances void transactions in which they are involved and by the availability of guardianships. *Dubree v. Blackwell*, 67 S.W.3d 286, 289 (Tex. App.—Amarillo 2001, no pet.) (citing *Edward D. Jones & Co. v. Fletcher*, 975 S.W.2d 539, 545 (Tex. 1998)).

"The relevant sections of the Texas Family Code do not prescribe a competency standard that a parent must meet before participating in a hearing or trial." *E.L.T.*, 93 S.W.3d at 375 (citing Tex. Fam. Code Ann. §§ 161.001–.210). To the contrary, as noted by our sister court in *E.L.T.*, a parent's mental illness may serve as a basis for involuntary termination of parental rights. *Id.* (citing Tex. Fam. Code Ann. § 161.003). *But see id.* at 377–81 (Guzman, J., concurring) (suggesting that a trial court should hold a competency hearing to gain a better understanding of a parent's capabilities and explore alternative remedies with regard to a parent's mental state, her ability to assist counsel, and whether the incompetency is temporary or poses a continuing threat to the parent or the child).

The Texarkana court has likewise recited that "there is no Texas authority which would permit a trial court to halt termination proceedings due to the incompetency of the parent." *R.M.T.*, 352 S.W.3d at 18. And a parent's mental capacity is probative of the best interest determination in a termination-of-parental-rights case because her mental issues are relevant to her ability to care for her child's physical and emotional needs throughout the child's life. *In re L.G.*, No. 04-15-00038-CV, 2015 WL 4113620, at *3 (Tex. App.—San Antonio July 8, 2015, no pet.) (mem. op.); *D.W.*, 353 S.W.3d at 191, 197; *see also J.J.A.*, 2018 WL 6614236, at *5 (holding that father who became physically incapacitated by stroke after termination petition

46

was amended failed to preserve due process complaint about notice when not raised

in the trial court).[26]

---

[26]A parent's mental health is frequently considered in reviewing the sufficiency of the evidence under endangerment grounds. *See L.M.F.*, 2014 WL 2465137, at *15–16 (holding evidence sufficient to support endangerment based in part on Mother's schizoaffective disorder, including auditory hallucinations, and failure to take her mental health medication, which led to her detention at hospital in restraints when she made threats about stabbing and shooting people); *In re M.A.P.*, No. 02-11-00484-CV, 2012 WL 2036457, at *8–10 (Tex. App.—Fort Worth June 7, 2012, no pet.) (mem. op.) (holding evidence of endangerment sufficient when mother continued to associate with violent father, used marijuana around infant and during the CPS case's pendency despite knowing that using it exacerbated her schizophrenia, and failed to take her mental-health medication); *Maxwell v. Tex. Dep't of Family & Protective Servs.*, No. 03-11-00242-CV, 2012 WL 987787, at *10–11 (Tex. App.—Austin Mar. 23, 2012, no pet.) (mem. op.) (recounting parent's paranoid schizophrenia diagnosis, manic episodes, delusions, hallucinations, mental health-related hospitalizations, and history of noncompliance with mental health medication to conclude evidence was factually sufficient under endangerment and best interest grounds). And the parent's ability to understand his or her own endangering behavior is not necessary for termination to be considered proper. *See In re D.R.,* No. 02-06-00146-CV, 2007 WL 174351, at *1, *6–7 (Tex. App.—Fort Worth Jan. 25, 2007, no pet.) (mem. op.) (holding endangerment evidence legally and factually sufficient with regard to mother suffering from severe mental retardation because "[t]he parent need not know that his or her own conduct is dangerous for a termination order pursuant to section 161.001(1)(E) to be proper"); *see also In re J.L.W.*, No. 02-08-179-CV, 2008 WL 4937970, at *7 (Tex. App.—Fort Worth Nov. 20, 2008, no pet.) (mem. op.) (holding endangerment evidence sufficient to support termination of parental rights to mentally-retarded special needs child when mother, also suffering from mental retardation, exposed child to domestic abuse that she was unable to recognize or acknowledge as dangerous, did not visit child for eight months, and made no efforts on service plan until a month before trial); *E.A.W.S.*, 2006 WL 3525367, at *11–12 (overdosing on sleeping pills while 39 weeks' pregnant, engaging in family violence, and mental instability supported trial court's endangerment findings); *In re R.W.,* 129 S.W.3d 732, 738–41 (Tex. App.—Fort Worth 2004, pet. denied) (abusing drugs and alcohol, which contributed to mental instability and suicidal ideation, were considerations in endangerment finding); *In re A.M.C.*, 2 S.W.3d 707, 716–17 (Tex. App.—Waco 1999, no pet.) (finding endangerment from mother's suicidal thoughts, suicide attempts, and neglect); *In re C.D.*, 664 S.W.2d 851, 853 (Tex. App.—Fort Worth 1984, no writ)

Based on the statutory provisions set out above and our review of the case law, whether a trial court has the authority or duty to sua sponte appoint a guardian ad litem for a *parent* in a termination-of-parental-rights proceeding is questionable at best because—as set out above—we have found no provision of the Family Code authorizing the appointment of a guardian ad litem for the adult respondent in such a proceeding. *See In re K.B.*, No. 07-16-00438-CV, 2017 WL 1365701, at *2–3 & n.4 (Tex. App.—Amarillo 2017, pet. denied) (mem. op.) (holding that the trial court did not abuse its discretion by denying the father's counsel's oral motion for appointment of a guardian ad litem for the father—assuming the trial court could have appointed one—when the record was insufficient to support it); *cf.* Tex. Disciplinary Rules Prof'l Conduct R. 1.02(g), *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. G, app. A (Tex. State Bar R. art. X, § 9) (requiring a lawyer to take reasonable action to secure the appointment of a guardian or other legal representative for, or seek other protective orders with respect to, a client whenever the lawyer reasonably believes that the client lacks legal competence and that such action should be taken to protect the client). *But see In re Thetford*, 574 S.W.3d 362, 372 (Tex. 2019) (orig. proceeding) ("Rule 1.02's requirement that an attorney take 'reasonable action' to protect a client

("While mental incompetence or mental illness alone are not grounds for termination of the parent-child relationship, when a parent's mental state allows him to engage in conduct which endangers the physical or emotional well-being of the child, that conduct has bearing on the advisability of terminating the parent's rights.").

expressly *allows*, but does not also *require*, the attorney to institute a guardianship proceeding.").

Further, the presence or absence of a guardian ad litem for the parent appears to make little difference in determining whether the parent's rights should be terminated. *See L.G.*, 2015 WL 4113620, at *6. In *L.G.*, for example, two months after the State removed the mother's newborn, a probate court found her to be mentally incapacitated and appointed her cousin as her legal guardian. *Id.* at *1. At trial, the psychologist who conducted the mother's psychological examination, her psychotherapist, her guardian, the DFPS caseworker, and the CASA volunteer all testified, after which the trial court terminated her parental rights. *Id.* The mother appealed, challenging the sufficiency of the evidence to support the trial court's best interest finding. *Id.*

Our sister court affirmed the trial court's judgment, finding ample evidence in the record to support the best interest finding. *Id.* at *3–6. The mother had completed the parenting course required by her service plan, but it took her three or four tries to do so and she was still unable to provide basic care for the child, such as preparing a bottle, changing a diaper, or consoling him, without the assistance of others to give her directions. *Id.* at *3. She also had a volatile, violent temper and became verbally and physically abusive when angry, and she had a history of bad choices with regard to drug and alcohol use, including her daily use of marijuana. *Id.*

49

at *4.  She refused to leave her boyfriend, a registered sex offender, and she refused to accept her guardian's assistance.  *Id.* at *5–6.

Likewise, in *D.W.*, the mother, who was "mentally of such a low level of intelligence as to be incapable of effectively rearing [a child]," was appointed a guardian ad litem during her termination case.[27]  353 S.W.3d at 191, 195–96.  The mother did not maintain contact with her attorney for several months and was finally located only after the trial, where her rights had been terminated on the basis of constructive abandonment.  *Id.* at 191–93, 195–96.  The court concluded that the evidence was legally and factually sufficient with regard to both constructive abandonment and best interest.  *Id.* at 196–97.  In the best-interest evaluation with regard to any excuse for the parent's acts or omissions, the court concluded that the mother's lack of mental capacity was the cause of her parental shortcomings.  *Id.* at 197.  The court noted that "regardless of the reasons (even though apparently entirely beyond her control) for her acts or omissions, they still exist and must be considered in determining the best interest of the child."  *Id.*

---

[27]The factual recitation in *D.W.* does not reflect whether the guardianship appointment was through the probate court.  353 S.W.3d at 195 ("A guardian ad litem was appointed for [Mother], who also attempted to assist her through the [CPS] process.").  The clinical psychologist who evaluated the mother explained that her mental retardation was such that she was unable to independently care for a child and could, at best, participate as a co-parent with a competent healthy caregiver who assumed primary childcare responsibility.  *Id.* at 196 (noting that expert said that giving the child back to the mother would be to award custody of a child who could not take care of itself to an adult who was unable to take care of herself).

And in *J.J.A.*, at the time of the termination trial, the father was under the care of Adult Protective Services because he lacked the ability to make financial decisions after he suffered a debilitating stroke that rendered him physically and mentally unable to attend to the children's needs. 2018 WL 6614236, at *2, *7. Prior to his stroke, the children had been removed from both parents and the State had sought termination of their rights; he had been a drug dealer who had addicted the mother, two decades his junior, to drugs and had an abusive relationship with her. *Id.* *1–2, *5–6. He had been a drug dealer throughout the children's lives and had been convicted of felony possession a year after his daughter's birth and five years after his son's birth; these facts helped satisfy the court's endangerment finding. *Id.* at *6. The father's inability, due to his stroke, to physically or mentally attend to the children's needs or to take care of himself, contributed to the court's best-interest finding. *Id.* at *7.

In *K.B.*, the Amarillo court considered whether the trial court had abused its discretion by denying the father's counsel's request for the appointment of a guardian ad litem. 2017 WL 1365701, at *1. The father's rights were terminated based on his failure to complete any of his court-ordered service plan and on constructive abandonment; he also had multiple arrests for public intoxication, possession of a controlled substance, and possession of drug paraphernalia during the case's pendency, was homeless, rarely kept in touch with his caseworker, and did not visit his children. *Id.* In the trial before the associate judge, the father's counsel asked for the appointment of a guardian ad litem because of the father's mental deficiencies. *Id.*

51

The associate judge denied the request, "explaining that guardianship proceedings were conducted in other courts under required procedures after proper pleadings and notice, and that she lacked authority to appoint a guardian for an adult." *Id.*

The father did not mention the denial of his request for a guardian ad litem in his request for a de novo hearing or at the de novo hearing before the district court, and the district court terminated his parental rights on the same grounds as the associate judge. *Id.* at *2. On appeal, the court held that the record was insufficient to show an abuse of discretion by the associate judge by denying the father's request for appointment of a guardian ad litem, particularly when the father did not renew that request in his hearing before the district court, which had reached the same outcome. *Id.* at *3. Further, the father did not challenge the sufficiency of the evidence to support that outcome. *Id.* at *1.

And in *K.M.L.*, the child's grandmother was appointed the mother's guardian approximately six weeks after the mother executed an affidavit of voluntary relinquishment. 443 S.W.3d at 106. The mother suffered from bipolar disorder and borderline intellectual functioning (her IQ was below 70) and had not been regularly taking her medication, and as testified by her psychiatrist, "there was 'no way [she] had the mental ability to understand the documents she had signed relative to' terminating her rights." *Id.* at 113. On appeal, the mother argued that the guardianship determination effectively nullified the affidavit, but the court held otherwise because the guardianship determination was made after she executed the

52

affidavit.  *Id.* at 111.  The court observed, "There is no legal authority for the proposition that a guardianship determination has retroactive effect such as to conclusively establish [the mother's] incapacity to knowingly and intelligently execute the affidavit of voluntary relinquishment."  *Id.* at 112.  The court nonetheless concluded that the evidence was insufficient to support the mother's knowing and intelligent voluntary relinquishment and remanded the case to the intermediate court to consider the factual sufficiency of the evidence to support the jury's findings on the other statutory termination grounds.  *Id.* at 115–16; *cf. In re Z.M.R.*, 562 S.W.3d 783, 786, 792–93 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (holding evidence sufficient to support voluntary relinquishment despite motion for new trial citing "newly discovered evidence" of the mother's IQ of 64, bipolar disorder, depression, other mental health conditions, and her failure to take prescribed medication for six years when the mother signed the affidavit on the day of trial, none of the witnesses who had worked in the case or evaluated or treated her expressed concerns about her ability to understand, and she did not allege involuntary relinquishment until two months after trial).

In contrast to the appointment of a guardian, a competency hearing may provide a layer of due process protection otherwise lacking in the Family Code.  *See E.L.T.*, 93 S.W.3d at 377–81 (Guzman, J., concurring).  In *E.L.T.*, when trial began, the mother made an oral motion for continuance and for a competency exam, which the trial court denied.  *Id.* at 374.  Our sister court upheld the denial of the motion for

continuance because the mother did not comply with Rule 251, and it treated the mother's complaint about the denial of her motion for a competency evaluation as waived because she failed to support her issue with citations to authority. *Id.* at 375; *see generally* Tex. R. App. P. 38.1(i). The court further observed that the relevant sections of the Family Code did not prescribe a competency standard that a parent must meet before participating in a hearing or trial and that the record reflected no trial court error when the parent's attorney—not the trial judge—must seek the appointment of a guardian for a client whom he reasonably believes is lacking legal competence. *E.L.T.*, 93 S.W.3d at 375–76 (citing Tex. Disciplinary R. Prof'l Conduct 1.02(g)).

When *E.L.T.* was decided, Texas intermediate courts were still split with regard to whether a parent in a termination-of-parental-rights case was entitled to effective assistance of counsel. *Id.* at 376. Thus, the court treated the right to effective assistance as hypothetical but nonetheless referenced the *Strickland* standard and record necessary to show ineffective assistance before concluding that nothing in the record supported the conclusion that the mother's trial counsel performed deficiently because of the mother's alleged incompetence and nothing in the record supported the conclusion that the result of the proceeding would have been different but for counsel's actions.[28] *Id.* at 376–77.

---

[28]Less than a year later, the supreme court held that the statutory right to counsel in parental-rights termination cases embodied the right to effective counsel.

54

Justice Eva M. Guzman, now a justice on the Texas Supreme Court, wrote a concurring opinion in *E.L.T.* in which she pointed out the legislative failure to adequately address parental competency in the context of parental-rights termination cases when, "under certain limited circumstances, there can be no guarantee that a party is effectively able to provide counsel with necessary or relevant data to prevent a wrongful deprivation of parental rights."[29]  *Id.* at 377 (Guzman, J., concurring).  She opined that because termination is the civil equivalent of capital punishment, the same due process procedure—a competency hearing—that in a criminal case protects someone "'whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense,'" should be provided.  *Id.* at 378, 380 (Guzman, J., concurring) (quoting *Alcott v. State*, 51 S.W.3d 596, 598 (Tex. Crim. App. 2001)).

Justice Guzman explained that a competency hearing would make the proceedings more fundamentally fair by reducing the risk of an erroneous termination of parental rights because

---

*M.S.*, 115 S.W.3d at 544 (observing that "it would seem a useless gesture . . . to recognize the importance of counsel in termination proceedings . . . and . . . not require that counsel perform effectively").

[29]Justice Guzman identified the following as what a competent parent could provide to his or her counsel:  sufficient information to rebut evidence offered by the State, affirmative proof of the existence or prospect of an ongoing parent-child relationship, and the establishment of tactical and substantive goals at the termination proceeding.  93 S.W.3d at 380 (Guzman, J., concurring).

> [it] would provide the trial court with an opportunity to gain a better understanding of the parent's capabilities as well as to explore alternative remedies. It would also afford the parties an opportunity to present the trial court with additional evidence concerning the parent's mental state, the ability of the parent to assist counsel, and whether the incompetency is temporary or poses a continuing threat to the parent or child.

*Id.* at 380 (Guzman, J., concurring). She nonetheless concurred with the majority's decision because other than conclusory remarks by the mother's attorney, the trial court was presented with no evidence to support the mother's alleged incompetence. *Id.* at 381 (Guzman, J., concurring).

But even a competency hearing, within the current statutory scheme, would appear to make little difference when compared to the child's best interest. *See R.M.T.*, 352 S.W.3d at 15, 25. In *R.M.T.*, the father, who suffered from schizoaffective disorder, polysubstance dependence, cognitive disorder, and personality disorder with paranoid and antisocial traits, had been determined incompetent to stand trial in his criminal case, and it was undisputed at the termination trial that he remained incompetent. *Id.* He filed a verified motion for continuance three days before trial, alleging his incompetence as the reason for the continuance, and to his motion, he attached eight exhibits that supported his incompetence claim. *Id.* at 16. After the trial court denied the motion, the father testified over his attorney's objection that he was not competent to do so. *Id.*

On appeal, the father complained, among other things, that the trial court had abused its discretion and violated his procedural due process rights by denying his

56

motion for continuance and proceeding to trial when he was incompetent. *Id.* The Texarkana court observed that the father had both a guardian ad litem and attorney ad litem and weighed the *Eldridge* factors in determining whether the father had received a fair hearing despite proceeding to trial while incompetent. *Id.* at 18, 20. It concluded that the trial court could not accommodate the child's interest in achieving permanency in a timely fashion without proceeding to trial while his father was incompetent because there was no indication that the father would regain competence by continuing the trial until the case's "drop dead date," at which time it would have been dismissed, leaving the child in limbo. *Id.* at 21, 23 ("In such a head-to-head conflict, one person's interest must trump the other; there, the interest of the child is the trump card."); *In re K.S.L.*, 538 S.W.3d 107, 116 (Tex. 2017) ("[T]he needs of the child are not best served by a legal process that fosters delay and unrestrained second-guessing.").

The court concluded that given the exigent circumstances in the case, and having weighed the practical requirements of the circumstances, the father was accorded the process he was due in his parental rights termination hearing when his rights were adequately protected at trial through his counsel's representation and the clear and convincing evidence standard of review. *R.M.T.*, 352 S.W.3d at 23 ("Given that [father] was provided with the full panoply of constitutional safeguards provided

57

by the Texas Family Code, we cannot conclude the risk of erroneous deprivation in this case was significant.").[30]

### c. Analysis

In a termination proceeding, the child's best interest is always the primary consideration. *See* Tex. Fam. Code Ann. § 153.002. Mother's mental health and drug issues, which led to the State's involvement for J.P.-L.'s protection, presented

---

[30]In a concurring opinion, Justice Jack Carter elaborated on the "drop dead" date by pointing out that in termination-of-parental-rights cases, the trial court's discretion "is effectively removed by the statute requiring dismissal of the case if it has not been resolved within the statutory limitation" and explained that it was unfair to the incompetent parent because he would not understand what was happening and because the State "may prematurely seek termination if the only other option is dismissal of the case." 352 S.W.3d at 27 (Carter, J., concurring). Justice Carter also pointed out that the probability that the child would be adopted, whether the child was thriving in his present environment, and whether resolving the parental rights situation immediately was necessary for the child's well-being were all matters "swept aside in a rush to conclude the case." *Id.* (Carter, J., concurring).

We are also faced with time constraints in termination-of-parental-rights cases, under Rule of Judicial Administration 6.2(a), which requires us to dispose of an appeal from a judgment terminating parental rights, "so far as reasonably possible," within 180 days of the date that the notice of appeal is filed. Tex. R. Jud. Admin. 6.2(a); *see* Tex. Fam. Code Ann. § 109.002(a-1) ("An appeal in a suit in which termination of the parent-child relationship is ordered shall be given precedence over other civil cases by the appellate courts, shall be accelerated, and shall follow the procedures for an accelerated appeal under the Texas Rules of Appellate Procedure."), § 263.405(a), (c) (stating that the appellate court "shall render its final order or judgment with the least possible delay," and requiring the supreme court to adopt rules "accelerating the disposition by the appellate court and the supreme court of an appeal of a final order granting termination of the parent-child relationship rendered under this subchapter"); *see also In re Occidental Chem. Corp.*, 561 S.W.3d 146, 166–67 (Tex. 2018) (Brown, J., concurring) (discussing constitutional concerns about statutorily-imposed deadlines for resolving cases).

impediments to J.P.-L.'s permanency and stability, and it is unclear at best—based on the law and the facts of this case—how a guardian ad litem appointed through a probate court might have changed the outcome other than to increase the amount of time J.P.-L. would spend in foster care. *See In re C.T.*, 491 S.W.3d 323, 328 (Tex. 2016) (orig. proceeding) (Guzman, J., dissenting) (noting that the legislature enacted a mandatory dismissal requirement to SAPCR proceedings filed by the State "[i]n an effort to minimize the amount of time children remain in foster-care limbo and to expedite permanency and stability"). That is, there is no guarantee that—assuming Mother could be located—she could regain competency within the statutory time frame.

Further, as the law currently stands, even assuming, without deciding, that her appointed counsel was ineffective by opting not to initiate a separate guardianship proceeding in the probate court, Mother cannot show on this record that there is a reasonable probability that the trial's result was not reliable. Accordingly, we overrule this portion of Mother's issues. *See* Tex. R. App. P. 44.1(a).

### 3. Failure to Force State to Proceed under Section 161.003

The legislature has expressly provided a means to terminate the parental rights of a parent suffering from a mental or emotional illness or a mental deficiency that renders her unable to provide for the child's physical, emotional, and mental needs. *See* Tex. Fam. Code Ann. § 161.003. Under Family Code Section 161.003, the trial court may order the termination of a parent-child relationship in a suit filed by the

59

State if it finds that (1) the parent has a mental or emotional illness or a mental deficiency that renders him or her unable to provide for the child's physical, emotional, and mental needs; (2) the illness or deficiency, in all reasonable probability, proved by clear and convincing evidence, will continue to render the parent unable to provide for the child's needs until the child's eighteenth birthday; (3) the State has been the child's temporary or sole managing conservator for at least 6 months preceding the date of the termination hearing; (4) the State has made reasonable efforts to return the child to the parent; and (5) the termination is in the child's best interest. *Id.* § 161.003(a).

During the oral argument of this case, Mother's counsel asserted that the State had "back-doored" a termination under Section 161.003 without meeting its procedural requirements. But Section 161.003 is not the exclusive way to terminate the parental rights of someone with a mental illness or deficiency. *See In re K.G.*, 350 S.W.3d 338, 351 (Tex. App.—Fort Worth 2011, pet. denied); *In re K.B.,* No. 02-09-00441-CV, 2010 WL 4028107, at *12 n.16 (Tex. App.—Fort Worth Oct. 14, 2010, no pet.) (mem. op.) ("Texas law provides that parental rights may properly be terminated when a trial court has made a finding under either section 161.001(1) or section 161.003, plus a best interest finding under section 161.001(2)."). The State is not required to file a case under Section 161.003, but "when a parent suffers from mental illness, section 161.003 may be more appropriate." *In re J.P.*, No. 02-07-00026-CV, 2008 WL 283295, at *13 (Tex. App.—Fort Worth Feb. 4, 2008, no pet.) (mem. op. on

reh'g); *see Liu v. Dep't of Family & Protective Servs.*, 273 S.W.3d 785, 791–802 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (analyzing appeal under both Section 161.003 and 161.001);[31] *In re B.G.S.*, No. 04-06-00562-CV, 2007 WL 1341401, at *1–4 (Tex. App.—San Antonio May 9, 2007, pet. denied) (mem. op.) (same);[32] *In re B.L.M.*, 114 S.W.3d 641, 648 (Tex. App.—Fort Worth 2003, no pet.) (upholding termination under Section 161.003 and not reaching the Section 161.001 grounds).[33]

While the State did not seek to terminate Mother's parental rights under Section 161.003, and the trial court did not actually terminate Mother's parental rights under that section, under the current statutory scheme, the State did not have to plead and prove those grounds, the trial court did not have to make findings thereon, and

[31]In *Liu*, the mother suffered from schizophrenia, and her mother and sister were appointed her co-guardians after she refused to take her medication and behaved in an unstable fashion. 273 S.W.3d at 787, 792. After the termination of parental rights case began, she was involuntarily hospitalized more than once because she was a danger to herself and others. *Id.* at 787–88.

[32]In *B.G.S.*, the mother refused to control her bipolar disorder with medication, and the court held that this was sufficient to support the trial court's findings under Section 161.003(a). 2007 WL 1341401, at *4.

[33]In *B.L.M.*, the father—a paranoid schizophrenic suffering from delusional thoughts and loosening of associations—received a new trial after his rights were terminated on a default judgment for failure to appear because he had been involuntarily committed in a mental institution in another state. 114 S.W.3d at 643. During trial, the father denied his mental health condition despite exhibiting signs of his condition throughout his testimony, and he indicated an intent to never take medication in the future despite the psychologist's testimony that paranoid schizophrenia was a prolonged and progressive illness with no effective cure and that it required consistent treatment and medication to stabilize. *Id.* at 645–46, 648.

the trial court did not have to assure Mother's capacity in order to effect a valid termination under Section 161.001. *See K.G.*, 350 S.W.3d at 351 (explaining that Section 161.003 is not the exclusive way to terminate the parental rights of someone with a mental illness or deficiency). And as set out above, the record before us is insufficient to determine whether her counsel was ineffective under *Strickland*, particularly when Mother concedes that the evidence is legally and factually sufficient to support the reliability of the trial court's judgment in this case. Accordingly, we overrule the remainder of Mother's issues.

## IV. Conclusion

Having overruled both of Mother's issues, we affirm the trial court's judgment.


/s/ Bonnie Sudderth
Bonnie Sudderth
Chief Justice

Delivered: December 19, 2019